United States District Court
Southern District of Texas
**ENTERED**
April 13, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROBERTO RIVERA, <u>et al.</u>, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. B: 19-cv-141 |
| | § | |
| CAMERON COUNTY, <u>et al.</u>, | § | |
| Defendants. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On July 24, 2019, Plaintiffs Roberto Rivera, Margarita Angulo Rivera, and Gabriel Benito Rivera ("Plaintiffs") filed a civil rights lawsuit. Dkt. No. 1.   The Plaintiffs are the heirs and representatives of the estate of Gabriel Angulo Rivera ("Rivera"), who died while in the custody of the Carrizales Rucker Detention Center. <u>Id</u>.   The Plaintiffs are suing Defendants Jaime Flores, Angelo Caballero, Ismael Gonzalez, Erasmo Salazar, Jacob Aguirre, Arnoldo Cantu Jr., Leonel Rodriguez, Omar A. Pena, Arquimedes Torres III, Roldan Aviles, Jorge Barrera ("individual Defendants") as well as Cameron County.

On January 13, 2022, the individual Defendants and Cameron County filed a motion for summary judgment. Dkt. No. 79.   On February 7, 2022, the Plaintiffs filed a response. Dkt. No. 86.   The motion has been fully briefed.   The parties have consented to have this case decided by the undersigned, pursuant to 28 U.S.C. § 636(c). Dkt. No. 31.

After reviewing the record and the relevant case law, the Court **ORDERS** that the motion for summary judgment be granted.   The Plaintiffs have failed to show a genuine dispute of material fact as to their claims.

**I. Background**

**A. Factual Background**

**1. Personal Background & Arrest**

Rivera was a former professional boxer, who was trained by his father. Dkt. No. 87-17, p. 6.   According to his son, Rivera competed in Golden Gloves boxing matches and

was a Texas state champion. Dkt. No. 87-19, p. 10.   After retiring from boxing, Rivera worked as a boxing trainer. Id., p. 9.   Rivera was five feet, nine inches tall and weighed 208 pounds. Dkt. No. 88-11, p. 21.   At one point, Rivera told a medical professional that had suffered over 300 concussions because of his boxing career. Id., p. 55.

Veronica Sanchez Marquez, Rivera's girlfriend, stated that he suffered from drug and alcohol addiction. Dkt. No. 79-1, p. 5.   She also stated that he was often in pain from his boxing injuries. Id.   On one instance when Rivera tried to stop drinking cold turkey, he "was always in the restroom throwing up" for two or three days. Id., p. 6.   She also reported that Rivera told her that he was bipolar. Id., p. 10.

There was an arrest warrant issued for Rivera for driving while intoxicated charge in July 2017. Dkt. No. 79-4, p. 5.   He was also wanted on a warrant for failing to appear at a child support hearing. Id., pp. 6-8.

On March 20, 2019, Rivera was arrested and booked in the Hidalgo County Sheriff's Office based on the two outstanding arrest warrants. Dkt. No. 79-4, p. 9.   On March 21, 2019, Rivera was booked at the Carrizales-Rucker Detention Center. Id., pp. 3, 37

### 2. Jail Intake

At the time that Rivera was booked at Carrizales-Rucker, he reported that he had four prescriptions: venlafaxine[1], quetiapine[2], naltrexone[3], and hydroxyzine[4]. Dkt. No. 80-2, p. 65.   The nurse who examined him noted that Rivera did not appear to be under the influence of drugs or alcohol or in withdrawal from either. Id., p. 66.   Rivera reported to

---

[1] Venlafaxine is approved by the FDA as a treatment for depression, anxiety, and panic disorder. Alan F. Schatzberg, Charles B. Nemeroff, Venlafaxine, in The American Psychiatric Association Publishing Textbook of Psychopharmacology, 517.

[2] Quetiapine is designed to treat bipolar disorder, depression, mania, and schizophrenia. Wiltz v. Neustrom, 2014 WL 250337, at *1 n. 1 (W.D. La. Jan. 22, 2014).

[3] Naltrexone helps "alcoholics stay alcohol-free." Velasquez v. Kijakazi, 2021 WL 4392986, at *9 n. 18 (S.D.N.Y. Sept. 24, 2021).

[4] Hydroxyzine is "a sedative drug for the treatment of anxiety and tension." U.S. v. Vepuri, 2022 WL 541772, at *2 (E.D. Pa. Feb. 23, 2022).

the nurse that he drank a 24 pack of beer each day but had last ingested alcohol three days earlier. Id.   He also reported that he expected to experience symptoms of withdrawal from alcohol and marijuana. Dkt. No. 88-11, p. 67.   Nurse "T. Lopez" filled out a form to refer him for an assessment by a doctor. Id., p. 21.   Rivera was not seen by a doctor, but the nurse's notes indicate that the nurse texted Dr. Almeida regarding Rivera's medications. Id., p. 22.   Dr. Almeida told the nurse to continue Rivera on naltrexone for two weeks; continue use of the venlafaxine; to use hydroxyzine as part of the withdrawal protocol; and continue us of the quetiapine, but watch for any instances of Rivera hoarding the medication. Id.

### 3. Withdrawal Begins

On March 22, 2019, Rivera was seen by a Jail Diversion worker from Tropical Texas Behavioral Health. Dkt. No. 88-11, p. 55.   He told the worker that he was suffering from sweating, which he believed "stemmed from his alcohol consumption and that he feels like he is going through withdrawals from alcohol." Id.   Rivera also reported that he was feeling anxious and was "not sure if it is a withdrawal symptom or just him developing anxiety as well." Id.

Just before 3 p.m. on that same day, Rivera called his girlfriend from the jail phone and the call was recorded. Dkt. No. 88.   During the call, Rivera told her, "I'm sweating. Like, right now, like crazy. And I feel like, I don't know, like I'm gonna die." Id., p. 2.   At the end of the call, he told her, "I'm gonna go throw up, I think. All right? I'll try and call you back." Id., p. 7.

Just after 4 p.m. – roughly 70 minutes later – Rivera called his girlfriend again. Dkt. No. 88-1.   He mentioned to her that he wanted someone to help him out "with better meds." Id., p. 7.

At some unspecified point during this time, Jailer Ismael Gonzalez had a conversation with Rivera in a booking cell. Dkt. No. 87-4, pp. 10-11.   Gonzalez said that Rivera talked "about how he wanted to get out but they weren't letting him get out, and then he also mentioned how he would drink a lot and that he thought it was going to affect

him." Dkt. No. 87-4, p. 10.   Gonzalez said that Rivera was "lucid" during this conversation. <u>Id</u>.

### 4. Withdrawal Symptoms Worsen

On March 23, 2019, Rivera called his girlfriend again. Dkt. No. 88-2.   He expressed a fear that other inmates were "plotting" to "turn and fucking jump on me." <u>Id</u>., p. 5.   He also told her that he hadn't "really been eating." <u>Id</u>., p. 7.

On that same day, Rivera signed a form, indicating that he was refusing his venlafaxine and naltrexone medications. Dkt. No. 88-11, p. 53.

On March 24, 2019, Rivera called his girlfriend around 1:00 p.m. Dkt. No. 88-3. He accused her of cheating on him the previous night, saying that he heard her having sex with the man "in the other room." <u>Id</u>., p. 3.   He claimed that his phone had a video where he had a gun in his mouth and his girlfriend pulled the trigger next to his head. <u>Id</u>., p. 6. During the call, Rivera denied that he was in jail the night before, but claimed that he and four other inmates were in a big house in San Benito. <u>Id</u>., pp. 8-9.   Rivera demanded that his girlfriend give him the phone number of a mutual friend, but she refused. <u>Id</u>

Roughly 20 minutes later, Rivera called her back, demanding the number and again accusing her of cheating the previous night. Dkt. No. 88-4.   She, again, refused to give him the mutual friend's phone number and eventually hung up on him. <u>Id</u>.

At 2:00 p.m., Licensed Vocational Nurse Pedro Botello noted that Rivera was brought to the infirmary for his vital signs to be checked and for an assessment because of a "family concern of him having a history of alcohol abuse." Dkt. No. 88-11, p. 20. Botello noted that Rivera was alert and "oriented x3."[5] <u>Id</u>.

At around 2:10 p.m., Rivera called his girlfriend again, demanding the phone number. Dkt. No. 88-5.   She refused, saying, "I already talked to Sylvia, she didn't want to talk to you." <u>Id</u>., p. 3.   Rivera again accused her of cheating on him the previous night and continued demanding the phone number. <u>Id</u>.

---

[5] Oriented times three means that a patient knows who they are, where they are and the time. William Eisenhower, A Bioethicist's Dictionary 109 (2022).

At 2:48 p.m., Rivera called his girlfriend again. Dkt. No. 88-6.   She told him that she was planning to visit him. Id., p. 2.   When he asked, "where?" she replied, "Carrizales." Id.   He told her that he was not at Carrizales, but that "It's like I'm [at] some school shit." Id., p. 3.   He claimed that he could "just walk out of here," presumably meaning the jail. Id.   Rivera continued to claim that his girlfriend had cheated on him and said that his son's birthday was the previous day, when it was not. Id., p. 7.   Rivera's girlfriend took the call while she was driving to the jail to check on him. Id.

Around 4:45 p.m., Rivera called his girlfriend again. Dkt. No. 88-7.   He asked where she was, accusing her of being with the man he had imagined her cheating on him with. Id., p. 2.   She told him:

> Baby, I went home [from visiting the jail] because they told me that you didn't have no visitation. So, I came home. Then I called medical and was asking them what was going on with you because you were being delusional with me. You were being nasty and crazy with me. So, they called me, his visitations have changed because they moved you to another cell by yourself. What happened?

Dkt. No. 88-7, p. 3.

Rivera claimed that it was because he had a seizure. Id.   When his girlfriend asked why he didn't tell her that, he claimed that he had told her earlier, but she hadn't listened. Id.   Rivera had not mentioned any seizure in his previous calls.   Rivera then questioned his girlfriend about whether the guy he accused her of cheating with had a venereal disease, such as AIDS or chlamydia. Id., pp. 3-4.   Rivera also claimed that his girlfriend had left him $300 on his window the previous night. Id., p. 5.

At 11:00 p.m., the jailers removed Rivera from his cell because the other inmates advised the jailers that "they did not want [Rivera] in [the] cell." Dkt. No. 88-13, p. 10. Rivera was moved to a different cell for his own safety. Id.

On March 25, 2019, at around 12:23 a.m. – less than 90 minutes later – Rivera was again removed from his cell when the inmates informed jail officials that they did not want Rivera in the new cell with them. Dkt. No. 88-13, p. 12.

At 5:10 a.m., Corporal Emanuel Zepeda responded to a call that an inmate wanted to speak to a supervisor. Dkt. No. 88-13, p. 14.   Zepeda met with Rivera and noticed that Rivera "began to show signs of erratic behavior," leading Zepeda to request that Rivera be examined by medical staff. Id.   Nurse Juan Conde examined Rivera and required Rivera to be kept in a holding cell on a 30 minute log, meaning that the jailers would check on Rivera every 30 minutes and log his behavior. Id.

From 6:30 a.m. until noon, Jailer Antonio Villarreal noted on the log that Rivera was "walking" and "talking to himself." Dkt. No. 88-11, p. 6.

### 5. First Altercation With Guards

Griselda Alaniz was a mental health counselor at the jail. Dkt. No. 87-11, p. 6.   On March 26, 2019, she encountered Rivera while he was under observation. Id.   She said that Rivera was "yelling" and banging on the cell. Id.   She said that she "couldn't really understand what – what he was saying." Id.   When Nurse Conde told her that Rivera was on the alcohol withdrawal protocol, she informed him that Rivera needed to be sent to the hospital for "medical clearance." Id.   As a mental health counselor, Alaniz was not licensed to prescribe medication or medically diagnose patients. Id., p. 7.   Alaniz met with Dr. Almeida while he was conducting clinic duty in the infirmary and Dr. Almeida agreed that Rivera needed to be sent to the hospital for "further evaluation." Dkt. No. 88-12, p. 2. An ambulance was called to take Rivera to the hospital. Id.

At noon, Jailer Gabriel Gomez, Sergeant Rafael Lucio, and Transport Officer Ricardo Najera, went to the holding cell to retrieve Rivera. Dkt. No. 88-10, p. 73. Gomez's written report states that Rivera "was without uniform," which is unclear as to what part of his jail uniform he was not wearing. Id.   Sergeant Lucio "verbally commanded" Rivera to "put his uniform on," and Rivera refused. Id.   Rivera "grabbed the holding cell door and window," which prevented the jail officials from entering the cell. Id.   Once the jail officials were able to open the cell, Rivera grabbed Sergeant Lucio's neck. Id.   As Gomez and Najera attempted to subdue Rivera. Id.   Rivera responded by

punching Gomez in the nose. Id.   The jail officials were able to subdue Rivera and placed him in mechanical restraints. Id.

### 6. Trip to Hospital

At 12:46 p.m., the ambulance arrived to take Rivera to Valley Regional Medical Center in Brownsville, Texas ("Valley Regional"). Dkt. No. 89, p. 2.   The EMS notes indicate that Rivera was "hearing voices." Id., p. 3.   The notes also state that Rivera was "extremely combative and uncooperative." Id., p. 4.   The notes do not indicate that the EMS crew was informed that Rivera was experiencing alcohol withdrawal. Id.

At 1:19 p.m., Rivera was examined by Dr. Geraldine Mullane at Valley Regional. Dkt. No. 89-1, p. 5.   Her treatment notes state that Rivera was brought to the emergency room "for evaluation of aggressive behavior onset today." Id.   Rivera admitted that he had been "banging his head against a brick wall" earlier that day. Id.   There is no indication that Dr. Mullane or any other medical professional at the hospital was informed that Rivera was experiencing alcohol withdrawal. Id.   Rivera reported hallucinations to Dr. Mullane, that he "saw 2 sunballs." Id.   Dr. Mullane prescribed Lorazepam and IV fluids. Id., p. 11. Rivera was discharged at 4:22 p.m. Id., p. 12.

Jacob Aguirre was a jailer who was tasked with picking up Rivera from the hospital and returning him to the jail. Dkt. No. 87-5, p. 14.   Aguirre saw hospital staff give Rivera a cup to provide a urine sample and Rivera intentionally chose to urinate on the floor instead. Id., pp. 15-16.   He said that Rivera laughed as he urinated on the floor. Id. Aguirre said that Rivera's mood would change quickly.   Rivera would be "nice" and   say things like, "Hey, let's cook out. Let's go cook out, let's go to the park, make some fajitas. You like fajitas?" Id., p. 14.   Aguirre said that Rivera "would just, you know, look away, and when he would look back he would look at you, take a deep breath and, you know, start trying to pull the handcuffs off. 'Break these things off. Give me some scissors; let me cut them open.' He was just not making any sense." Id.

### 7. Return to the Jail

At 2:00 p.m., there was a shift change at the jail and Sergeant Arnoldo Cantu, as the shift leader, briefed the jail staff. Dkt. No. 87-1, p. 15.   As part of the pre-shift briefing, he informed the jail staff that Rivera "was sent to the hospital and that he had been combative prior to going to the hospital." Id.   He told them that if they encountered Rivera that they should "take caution with him," because was he a former boxer and "he does know how to fight." Id.   Cantu admitted that he did not expect his shift to have any interaction with Rivera because "[w]henever we send somebody to the hospital that's in that state of mind, they usually stay there overnight, at least for 24 hours," for complete observation. Id.

Jailer Angelo Caballero remembered the briefing as Cantu warning the jailers that Rivera had assaulted members of the transport staff earlier in the day and that they should take precautions – such as having another jailer present when opening the cell – if they encountered Rivera during their shift. Dkt. No. 87, pp. 6-7.   Caballero also remembered that Cantu told the jailers that Rivera had boxing and mixed martial arts training. Id., p. 12. Jailer Arquimedes Torres III also remembered Cantu briefing the jailers that Rivera had punched a jailer earlier in the day and that Rivera was a trained boxer. Dkt. No. 87-2, p. 21.

Once Aguirre brought Rivera back to the jail, a picture was taken of Rivera's face because, according to Aguirre, Rivera had "cuts on his face or bruising on his eye or something" from the prior cell extraction. Dkt. No. 87-5, p. 16.   The image shows Rivera with bruising on the bridge of his nose and above his left eyebrow. Dkt. No. 86, p. 16.

After Rivera returned to the jail, Sergeant Cantu wanted to have Rivera placed in a padded cell. Dkt. No. 87-1, p. 21.   He testified at his deposition that:

> because he had already assaulted staff members prior to returning from the hospital, and from my observation of the way he was acting when he returned from the hospital, I saw that he could possibly be a danger to himself or others. So in my opinion, that would have been an automatic call to be placed into the padded cell.

Dkt. No. 87-1, p. 21.

Jail policy was that, if an inmate was experiencing medical problems, then the medical staff would determine where the inmate would be placed. Dkt. No. 87-1, p. 21. Sergeant Cantu testified that Alaniz, the mental health counselor, said, "No, put him in the holding cell. If he acts up, then place him into the padded cell." Id., p. 33.   At her deposition, Alaniz denied any recollection of talking to the officers about where Rivera should have been placed. Dkt. No. 87-11, p. 17.   At 5:18 p.m., Nurse Botello noted that "as per Griselda Alaniz MHC [Rivera is] to be placed in holding cell single cell regular suit, 15 min log and if he starts [any] abnormal behavior or being aggressive to be placed in padded cell." Dkt. No. 88-11, p. 19.

At 5:24 p.m., Rivera was placed in a non-padded holding cell. Dkt. No. 88-14.   For the next two hours, until around 7:20 p.m., Rivera "was banging on the door using his hand, shoulders and feet while screaming for his mother's help." Id.   Gonzalez, the jailer who had a lucid conversation with Rivera earlier in his incarceration, said that Rivera "went from being completely like a normal person to not even understanding when somebody was telling him something, like you would talk to him and he would just yell at you or he would just stand hours straight screaming and yelling." Dkt. No. 87-4, p. 11.

### 8. The Second Altercation

At 7:24 p.m., medical staffer Angelina Castaño was performing her rounds while Rivera continued with his banging and screaming. Dkt. No. 88-14.   Jailer Alexsandra Gonzalez stated that she asked Rivera to stop, but he refused. Id.   Castaño instructed Jailer Jaime Flores to have Rivera moved into a padded cell. Id.

Sergeant Cantu went to the cell to calm Rivera down in advance of the move to a padded cell. Dkt. No. 87-1, p. 24.   He noticed that Rivera's face was pale and his lips dry, despite Rivera being sweaty from kicking the door. Id.   Cantu thought this was an indicator that Rivera was dehydrated. Id.   Cantu ordered Rivera to put his hands through the food tray slot to have handcuffs placed on him, but Rivera refused. Id.   Rivera responded, "No, I'm not going anywhere." Id., p. 25.

Cantu also tried to give Rivera a "suicidal smock" to be put on before being placed in the padded cell. Dkt. No. 87-1, p. 24.   Rivera refused the smock, yelling "Get her out of here. I don't want her here." Id.   Cantu said that this response didn't make sense and he did not know who "her" was a reference to. Id., pp. 24-25.   Cantu testified at his deposition that he did not believe that Rivera was in his right mind at that moment. Id.

Cantu testified that Rivera "was not cooperating with the directives I was giving, so my next step was to spray the [pepper] spray in order for us to be able to restrain him and put him into the padded cell." Dkt. No. 87-1, p. 25.   When Cantu used the pepper spray, Rivera began to take off his orange jail uniform while yelling, "I can't see" and grunting. Id.   Rivera went to the toilet inside of his cell and splashing toilet water on his face. Id. Cantu ordered him to lie face down on the floor; Rivera replied, "You better not spray me or I'm going to kill you." Id.

As Cantu continued to order Rivera to lie face-down on the floor, Rivera began to yell and hit the walls. Dkt. No. 87-1, p. 25.   At that point, Cantu entered the holding cell and demanded that Rivera lie on the floor. Id.   When Rivera maintained his refusal to comply, Cantu sprayed him a second time with the pepper spray. Id.   According to Cantu, this caused Rivera to become "more agitated." Id.

Caballero testified that the pepper spray was necessary because without it, there was no way for a jailer to enter the cell without being assaulted. Dkt. No. 87, p. 14.   Caballero said that Rivera "was punching like stuff at full force, you know, what it seemed like to me, and hitting walls, you know, without any like -- like no pain. He was just hitting it like it was normal, like a punching bag or something." Id.   Jailer Jorge Barrera testified that Rivera would punch the metal inside of the cell and the walls of the cell and "nothing seemed to [faze] him." Dkt. No. 87-7, p. 24.

Cantu testified that Rivera took off his white boxer shorts – now only wearing one pair of white undergarments – and used his shorts to wipe his face. Dkt. No. 87-1, p. 26. Rivera again splashed his face with the toilet water. Id.   Cantu testified that, "At this point I'm thinking the only way that we're going to get him out of the cell – because he's refusing

orders and the [pepper] spray is having no effect on him, that we are going to have to go into the cell to extract him." <u>Id</u>.

Cantu decided that the only way they were going to be able to safely extract Rivera was to use a "riot shield extraction." Dkt. No. 87-1, p. 26.   Nine jail officials – Angelo Caballero, Arquimedes Torres III, Erasmo Salazar, Ismael Gonzalez, Jacob Aguirre, Jaime Flores, Jorge Barrera, Leonel Rodriguez, and Roldan Aviles – came with Cantu to assist with the extraction. <u>Id</u>.   The plan was for Jailer Jaime Flores to enter the cell with the riot shield, use the shield to protect officers from any blows from Rivera and the remaining jail officials would grab Rivera's arms or legs to restrain him, place him on the floor and then move him to the padded cell. <u>Id</u>.

Flores testified that the riot shield was curved to go around himself, as opposed to being curved to fit around Rivera. Dkt. No. 87-6, p. 27.   When Flores entered the cell, Rivera had his back toward him, but as Flores approached, Rivera began to turn his body toward Flores. <u>Id</u>, pp. 27-28.   While Flores admitted that the shield contacted Rivera's right midsection, he testified that, "I didn't hit him hard. I just, you know, was able to just have him turn towards the wall." <u>Id</u>.

Caballero was given the handcuffs and was able to grab Rivera's right wrist. Dkt. No. 87, p. 20.

Cantu testified that when Flores struck Rivers with the riot shield, Rivera's hands and head "made contact with the wall." Dkt. No. 87-1, p. 27.   The cell had a concrete bench that was part of the wall; Cantu testified that Rivera fell down on to the bench. <u>Id</u>. From there, Rivera was moved to the floor; Cantu described the movement from the bench as being "gently placed onto the floor." <u>Id</u>.   Caballero testified that Rivera "dropped down to the floor on his own," dropping "on his own weight" as a way to attempt to escape. Dkt. No. 87, p. 20.   Caballero stated that when an inmate is taken down as a result of force, then the jailers naturally move in "the direction that the person dropped," but Rivera "went straight down." <u>Id</u>.   Torres testified that "in one motion [Rivera] gets hit with the shield

and his body hits the wall, his shoulder hits the wall, slides down, his butt hits the bench, and then he slides off the bench onto the floor." Dkt. No. 87-2, p. 26.

When Rivera went down on the floor, he kept his arms tucked underneath his body to avoid having them placed in handcuffs. Dkt. No. 87-1, p. 27.   Corporal Erasmo Salazar testified that Rivera was "doing pushups with the officers on his back." Dkt. No. 87-3, p. 19.   Cantu testified that he never saw any officer get on Rivera's back. Dkt. No. 87-1, p. 29.   Eventually, the officers were able to place handcuffs and leg restraints on Rivera. Id.; Dkt. No. 87, p. 21.   Even though Rivera's arms and legs were restrained, he was continuing to move his arms and attempt to kick his legs. Id., pp. 27-28.   Jailer Leonel Rodriguez said that Rivera was "straightening his body and [was] not bending it to sit down." Dkt. No. 87-8, p. 18.

During the time that the officers were struggling with Rivera, Flores went to retrieve the "safety restraint chair" from the booking area. Dkt. No. 87-6, p. 28.   Flores stated that the chair was usually used on uncooperative inmates so they could "calm down." Id.

When Rivera was placed in the restraint chair, he began spitting blood at the jail officials. Dkt. No. 87-1, p. 28.   Cantu believed that Rivera had a bleeding wound on his forehead and was spitting the blood that ran down his face from the wound. Id.   Cantu ordered that a spit mask be placed on Rivera. Id.   Cantu also believed that the wound happened when Rivera's forehead – which was already bruised before he was placed in the cell – hit the wall when he was hit by the riot shield. Id.   Barrera testified that he believed that the cut happened when Rivera hit the wall, because when Barrera tried to grab Rivera, he "saw the blood on [Rivera's] head." Dkt. No. 87-7, p. 22.   Barrera also described the spitting as Rivera "blowing [the blood] as it was falling down his – his lips." Id., p. 23.

Rivera spit the blood on to Caballero and Pena, both of whom were later sent to be tested for hepatitis. Dkt. No. 87, pp. 21-22.   Salazar testified that Rivera was not choking on the blood because he was "breathing normal[ly]." Dkt. No. 87-3, p. 20.   Aguirre testified that when Rivera was strapped to the chair, "He was conscious, he was breathing, and [. . . ] was continuing to fight being restrained." Dkt. No. 87-5, p. 24.

Cantu also testified that the seat for the restraint chair is on a decline. Dkt. No. 87-1, pp. 29-30.   When placed in the restraint chair, Rivera put his arms behind his back and was "able to push both jailers out of the way and stand up." Id.   When Rivera was placed back in the chair, he again used his strength to push himself back up and stand. Id.   When he was placed back in the chair, the officers put a shoulder strap over him to prevent him from standing up. Id.   Jailer Omar Pena was not part of the original extraction team, but came to assist after Rivera was already on the ground. Dkt. No. 87-9, pp. 14-15.   Pena testified that he pushed down on Rivera's left shoulder so that Rivera's "rear end would be in the seat" and his head would naturally face down to avoid having more blood spit on the officers. Id., p. 17.

Cantu testified that he did not strike Rivera with his fists or elbow; did not kick or knee him; or hit him with any object. Dkt. No. 87-1, p. 29.   He also testified that he did not see any other officer take any of those actions. Id.   He also stated he did not see any officers strike Rivera with objects, place him in a chokehold, or get on his back. Id. Caballero, Torres, Salazar, Gonzalez, Aguirre, Flores, Barrera, Rodriguez, Pena, and Aviles all testified to the same – that they did not strike Rivera and did not see any other officer strike Rivera. Dkt. No. 87, p. 25 (Caballero); Dkt. No. 87-2, pp. 27-28 (Torres); Dkt. No. 87-3, pp. 15, 21-22 (Salazar); Dkt. No. 87-4, pp. 29-30 (Gonzalez); Dkt. No. 87-5, p. 24 (Aguirre); Dkt. No. 87-6, pp. 29-30 (Flores); Dkt. No. 87-7, pp. 21-22 (Barrera); Dkt. No. 87-8, p. 18 (Rodriguez); Dkt. No. 87-9, p. 16 (Pena); Dkt. No. 87-10, p. 14 (Aviles).

Once Rivera was strapped to the restraint chair, Cantu testified that Rivera continued to grunt and mumble to himself. Dkt. No. 87-1, p. 30.   Once Rivera was wheeled out of the cell, Cantu testified that he stopped speaking. Id.   Torres testified that when Rivera was being moved out of the cell, toward the medical area, he "was still moving and yelling." Dkt. No. 87-2, pp. 30, 32.   Salazar left the cell before Rivera was moved; he said that when he left, Rivera was talking, breathing and conscious. Dkt. No. 87-3, p. 22.   Pena

testified that as Rivera was being rolled out of the cell, he was yelling and talking. Dkt. No. 87-9, pp. 18-19.

Aguirre testified that while they were wheeling Rivera to the medical area, he was still talking, saying things like, "Come on, man, take it off. Let's go one on one. Let's go one on one." Dkt. No. 87-5, p. 25.   But once they arrived at the medical room, Aguirre testified that he remembered Rivera "just taking a breath, throwing his head back, you know, like if he was exhausted of -- of a workout, and after that they were checking his vitals. After that, he didn't respond anymore." Id.

When Rivera arrived at the medical area, Nurse Botello assessed his vital signs and concluded that Rivera was non-responsive. Dkt. No. 87-1, p. 30; Dkt. No. 87-12, p. 21. Botello ordered that Rivera be placed on the floor with no restraints on him. Dkt. No. 87-1, p. 30.   At 7:45 p.m., the jail called for an ambulance to take Rivera to the hospital. Id. At 7:48 p.m., jail staff began performing chest compressions on Rivera. Id., pp. 30-31.   At 7:59 p.m., the ambulance arrived for Rivera. Id.   The ambulance staff used a medical robotic machine to perform chest compressions on Rivera. Id., p. 34.   At 8:09 p.m., the ambulance left for the hospital. Id., pp. 30-31.

The next morning, March 26, 2019, at 8:00 a.m., Rivera was pronounced dead. Dkt. No. 89-4, p. 3.

There is a surveillance video of the extraction, taken from the view of the center of the room outside of the cells. Dkt. No. 110.   It shows the officers gathering outside of Rivera's unpadded cell; an officer retrieving the shield; the officers entering the cell; an officer retrieving the chair; an officer retrieving the spit mask; and the officers wheeling Rivera to the medical area. Id.   It also shows Botello checking Rivera's vital signs and attempts to revive Rivera. Id.   Because of the angle of the camera, it does not clearly show the individual Defendants' actions inside of the cell, so it does not show if any officer used excessive force.

### 9. Autopsy

Jonathan D. Gracia, a Cameron County Justice of the Peace, authorized the performance of an autopsy. Dkt. No. 89-4, p. 4.

Dr. Elizabeth Miller performed the autopsy on March 26, 2019, the day of Rivera's death. Dkt. No. 89-4, p. 3.   As for his injuries, she noted blue and purple contusions on Rivera's face, abrasions on his nose, a laceration near his left eyebrow and "periorbital ecchymosis"[6] on both eyes. Dkt. No. 89-4, p. 6.   Dr. Miller also noted the presence of subconjunctival hemorrhaging.[7] Dkt. No. 89-4, p. 6.   Dr. Miller also noted a contusion on Rivera's right lower lip and bleeding on the edges of his tongue. Dkt. No. 89-4, p. 6.   The autopsy noted subgaleal hemorrhaging[8] in the "right temporal and occipital regions, as well as within the posterior vertex and left frontal, temporal, and occipital regions." Id. The autopsy also noted soft tissue hemorrhaging in both orbital cavities. Dkt. No. 89-4, p. 6.

Dr. Miller noted that six of Rivera's right ribs and four of his left ribs were fractured. Dkt. No. 89-4, p. 6.   She also stated that his torso had "scattered purple and blue contusions, as well as focal small abrasions." Id.   His torso also had focal soft tissue hemorrhaging. Id.   The autopsy also noted the presence of 10cc of blood in the right pleural cavity and 60 cc of blood in the left pleural cavity. Id.

Blood testing showed that Rivera had a gene mutation in his DNA, known as SCN5A. Dkt. No. 89-4, p. 21.   This gene mutation can "support a diagnosis of cardiomyopathy or indicate a predisposition for cardiomyopathy." Id.   This gene mutation

---

[6] Periorbital ecchymosis is a medical term for a black eye. Marcia K. Anderson, Fundamentals of Sports Injury Management 85 (2003).

[7] This condition is when small capillaries in the eye rupture, making the white of the eyes appear "red, blotchy and inflamed." Anderson at 85.

[8] Subgaleal hemorrhaging happens when "trauma has produced tears in the scalp vessels so that blood accumulates under the temporalis muscle or other connective tissue planes in the head." Jan. E. Leestma, Forensic Neuropathology 69 (2008).

can result in Brugada Syndrome, which "a heart condition that results in disruption of the heart's normal rhythm." <u>Hadley v. AstraZeneca Pharms. PLC</u>, 2018 WL 4491184, at *1 (S.D. Ill. Sept. 19, 2018).   Dr. Miller concluded that Rivera's death was an "accident" that was caused by "Brugada Syndrome complicated by agitation, physical altercation and restraint." Dkt. No. 89-4, p. 4.

At her deposition, Dr. Miller stated that she didn't have any evidence of trauma that would have caused a cardiac arrest. Dkt. No. 87-14, pp. 18-19.   She explained that she "didn't find any anatomical injury that would result in a sudden cardiac arrest." <u>Id</u>.   Dr. Miller discounted the rib fractures as a possible cause of such trauma because the blood in the pleural cavities was too insignificant to have caused any cardiac arrest. <u>Id</u>.   She also noted that the "placement of the left rib fractures and the anterior portion and numbers two through six are suggestive of the region where we do commonly see CPR-related fractures," but that she could not "say with certainty" that the CPR caused those fractures. <u>Id</u>.   Dr. Miller explained that because the EMTs were able to get Rivera's heart beating in the ambulance, it took away her ability to determine if the rib fractures occurred after his heart initially stopped beating. <u>Id</u>.

Dr. Miller noted that on the right side of Rivera's torso showed "some oval-to-round contusions that were consistent with fingertip type grabbing contusions." Dkt. No. 87-14, p. 30.

The Plaintiffs have submitted an expert witness opinion from Dr. Roger Mitchell, the former chief medical examiner for Washington D.C. Dkt. No. 96-9.   Dr. Mitchell opines that the "altercation between the officers and Mr. Rivera caused an acute cardiac event that led to his death. It is the opinion of this forensic pathologist that without the altercation Mr. Rivera would not have died at the time that he did." Dkt. No. 96-8, p. 5. He discounts Dr. Miller's diagnosis that Brugada Syndrome was the primary cause of death, stating that diagnosing Brugada Syndrome "requires in-depth evaluation including, but not limited to, a clinical profile, a family history and pedigree evaluation, and a series of electrocardiograms (ECG)." <u>Id</u>., p. 6.

### 10. Training & Policies on Force

All of the officers in this case testified that they were trained and licensed as county jailers pursuant to training provided by the Texas Commission on Law Enforcement. Dkt. No. 87, p. 3 (Caballero); Dkt. No. 87-1, p. 4 (Cantu); Dkt. No. 87-2, p. 5 (Torres III); Dkt. No. 87-3, p. 3 (Salazar); Dkt. No. 87-4, p. 3 (Gonzalez); Dkt. No. 87-5, p. 5 (Aguirre); Dkt. No. 87-6, p. 3 (Flores); Dkt. No. 87-7, p. 2 (Barrera); Dkt. No. 87-8, p. 3 (Rodriguez); Dkt. No. 87-9, p. 3 (Pena); and Dkt. No. 87-10, p. 3 (Aviles).   Indeed, such training is legally mandated. TEX. OCC. CODE § 1701.301.

The Plaintiffs have submitted the expert opinion report of Steve Martin, a corrections consultant and attorney. Dkt. No. 96-3.   Martin asserts that Cameron County did not have a written policy for the proper use of force and that "[a] detailed and discrete set of policies and procedures for staff use of force is an absolutely essential and core element for the safe operation of a jail." Dkt. No. 96-2, p. 4.   Martin also noted that Cameron County did not have ongoing in-service training related to the use of force beyond the licensing training that the officers received. Id.   He stated that "[j]ail operations are highly dynamic overtime thus requiring ongoing and active training for jail personnel in order for them to be current with safe operating practices and to ensure that unsafe practices are minimized." Id.   Martin did not explain why the initial licensing training was insufficient to meet constitutional standards.

### 11. Training & Policies on Alcohol Withdrawal

The jail's substance abuse withdrawal protocols called for 25 mg of Vistaril to be administered in the morning and 50 mg in the evening, for 10 days. Dkt. No. 88-16.   It also calls for 100 mg of vitamin B to be administered every day for 30 days. Id.   The inmate is to be encouraged to take "extra sweets and fluids." Id.   Additionally, the inmate's vital signs are to be taken every shift for 10 days and they are to be subject to observation every 30 minutes for those 10 days. Id.   Jail officials are instructed to send the inmate to the emergency room for alcohol withdrawal if they present "with uncontrolled eye movements, eye drooping or responds that an imaginary string held across in front of face

17

is a certain color." <u>Id</u>. (internal quotation marks omitted).   If an inmate presents with "severe alcohol withdrawal," then the protocol requires that the inmate be given 5 mg of Librium three times a day for three days, followed by twice a day for three days, followed by once nightly for three days, followed by every other night. <u>Id</u>., p. 2.   They are also to be given 100 mg of Vitamin B every morning for a month. <u>Id</u>., p. 2.   If the inmate has elevated blood pressure, they are to be given .1 mg of clonidine twice a day. <u>Id</u>., p. 2.

The Plaintiffs have submitted an expert opinion from Dr. Jeffrey Keller, who is a fellow of the American College of Correctional Physicians. Dkt. No. 96-7.   Dr. Keller states that the jail's alcohol withdrawal protocols were "inadequate to the point of being deliberately indifferent to his medical needs and did not meet the current medical standard of care." <u>Id</u>., p. 15.   He asserts that Visatril does not work in the treatment of alcohol withdrawal because it is not a benzodiazepine. <u>Id</u>   He also asserts that the amount of Librium prescribed is inadequate because 5mg Librium pills are manufactured for children and that someone in Rivera's state would need 50 to 100mg each hour. <u>Id</u>., p. 17.   Dr. Keller also stated that the protocol is deficient for failing to include a scoring system to "grade the severity of alcohol withdrawal." <u>Id</u>., p. 15.   He also noted that the instructions to send the inmate to the emergency room for alcohol withdrawal if they present "with uncontrolled eye movements, eye drooping or responds that an imaginary string held across in front of face is a certain color" is nonsensical and has no medical validity. <u>Id</u>., p. 16.

The jailers all testified that they did not know what <u>delirium tremens</u> was and were not trained on how to handle inmates who were suffering from alcohol withdrawal. Dkt. No. 87, pp. 9, 11 (Caballero); Dkt. No. 87-1, p. 12 (Cantu); Dkt. No. 87-2, pp. 17-19 (Torres); Dkt. No. 87-3, pp. 17-18 (Salazar); Dkt. No. 87-4, pp. 12, 16 (Gonzalez); Dkt. No. 87-5, pp. 8-11 (Aguirre); Dkt. No. 87-6, p. 21 (Flores); Dkt. No. 87-7, p. 11 (Barrera); Dkt. No. 87-8, p. 8 (Rodriguez); Dkt. No. 87-9, pp. 8-9 (Pena); Dkt. No. 87-10, p. 8 (Aviles).

**B. Procedural History**

On July 24, 2019, the Plaintiffs filed a civil rights suit against Cameron County and "unnamed employees of the Cameron County Sheriff's Department." Dkt. No. 1.   As to Cameron County, the Plaintiffs alleged that the County had policies of permitting the excessive use of force and of denying timely medical care. Id., pp. 4-6.   As to the unnamed employees, the Plaintiffs alleged that they used excessive force and then failed to administer life-saving care. Id., pp. 6-8.

On September 23, 2019, Cameron County and the unnamed defendants filed a motion to dismiss, pursuant to FED. R. CIV. P. 12(b)(1) and FED. R. CIV. P. 12(b)(6). Dkt. No. 6.   The motion was fully briefed. Dkt. Nos. 9, 15, 17.

On October 11, 2019, the Plaintiffs filed a first amended complaint, which added additional facts, but no new claims. Dkt. No. 8.

On December 16, 2019, the Court converted the motion to dismiss into a motion for summary judgment, pursuant to FED. R. CIV. P. 12(d). Dkt. No. 21.   The Court found that in order to resolve the issues posed by the motion to dismiss, it would have to consider matters outside of the record, necessitating that the motion be converted into one for summary judgment. Dkt. No. 21.

On August 18, 2020, the Plaintiffs filed a second amended complaint, which identified Flores, Caballero, Gonzalez, Salazar, Aguirre, Cantu, Rodriguez, Pena, Torres, Aviles, and Barrera as the individual defendants. Dkt. No. 34.

On October 7, 2020, the Plaintiffs filed a third amended complaint, which added claims regarding the use of the spit mask. Dkt. No. 40.

On December 7, 2020, Cameron County and the individual Defendants filed a motion to dismiss the third amended complaint. Dkt. No. 49.   On January 27, 2021, the Court dismissed the claims against Cameron County, but converted the motion to dismiss against the individual Defendants into one for summary judgment. Dkt. No. 60.

On March 9, 2021, the Plaintiffs filed a motion for reconsideration of the dismissal of the claims against Cameron County. Dkt. No. 60.   On March 17, 2021, the Plaintiffs

filed a motion for leave to file a fourth amended complaint, which further fleshed out its factual claims against Cameron County. Dkt. No. 65.

On May 3, 2021, the Court granted the motion for reconsideration and the motion for leave to file the fourth amended complaint, finding that the proposed amended complaint stated non-futile claims against Cameron County. Dkt. No. 68. The fourth amended complaint is the operative complaint in this case. Dkt. No. 69.

On January 13, 2022, Cameron County and the individual Defendants timely filed a motion for summary judgment. Dkt. No. 79. The individual Defendants argued that there was no genuine dispute of material fact as to whether they used excessive force against Rivera; whether they were bystanders who allowed others to use such force; and that they were entitled to qualified immunity. Id. Cameron County argued that there was no genuine dispute of material fact as to whether its policies on use of force, training or alcohol withdrawal were constitutionally deficient. Id.

On February 7, 2022, the Plaintiffs filed their response to the motion for summary judgment. Dkt. No. 86. As to the claims against the individual Defendants, the Plaintiffs argue that because the only surviving witnesses to the extraction are the individual Defendants, that fact alone creates a genuine dispute of material fact. Id., p. 38 (citing Bazan ex rel Bazan v. Hidalgo County, 246 F3d 481 (5th Cir. 2001)). They also argue that the pervasive and severe nature of Rivera's injuries is inconsistent with the individual Defendants' claim that none of them punched or kicked Rivera. As to the claims against Cameron County, the Plaintiffs argue that the testimony of Dr. Keller and Martin create a genuine dispute of material fact as to the inadequacies of the county policies. Dkt. No. 86, pp. 40-42.

On February 28, 2022, Cameron County and the individual Defendants filed a reply brief. Dkt. No. 105.

## II. Applicable Law

### A. Section 1983

As relevant here, 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Id.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144, n. 3 (1979).   To prevail upon a § 1983 claim a plaintiff must establish two elements: (1) a constitutional violation; and (2) that the defendants were acting under color of state law when they committed the constitutional violation. Whitley v. Hanna, 726 F.3d 631, 638 (5th Cir. 2013).

### B. Summary Judgment

Summary judgment is appropriate when the moving party has established that the pleadings, depositions, answers to interrogatories, admissions, and affidavits – if any – demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).   "Only disputes over facts that might affect the outcome of the suit under the governing law will preclude summary judgment." Offshore Drilling Co. v. Gulf Copper & Manufacturing Corp., 604 F.3d 221, 227 (5th Cir. 2010).   Accordingly, a "genuine issue of material fact exists where evidence is such that a reasonable jury could return a verdict for the non-movant." Piazza's Seafood

World, L.L.C. v. Odom, 448 F.3d 744, 752 (5th Cir. 2006).

If "the nonmoving party will bear the burden of proof at trial on a dispositive issue," then "a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

"If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." Norwegian Bulk Transport A/S v. International Marine Terminals Partnership, 520 F.3d 409, 412 (5th Cir. 2008). The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. Id.

Additionally, the Court must review all evidence in the light most favorable to the non-moving party. Piazza's Seafood World, 448 F.3d at 752. "We resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Spring Street Partners-IV, L.P. v. Lam, 730 F.3d 427, 435 (5th Cir. 2013). The Court cannot "assume, however, in the absence of any proof, that the nonmoving party could or would prove the necessary facts." Paz v. Brush Engineered Materials, Inc., 555 F.3d 383, 391 (5th Cir. 2009).

Finally, "[a] court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (internal quotations omitted).

### C. Excessive Force

"To establish the use of excessive force in violation of the Constitution, a plaintiff must prove: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Elizondo v. Green, 671 F.3d 506, 510 (5th Cir. 2012) (quoting Collier v. Montgomery, 569 F.3d 214,

218 (5th Cir. 2009)).

In determining whether the use of force was excessive and unreasonable, the Court is to be guided by "the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. 386, 396 (1989).   The "reasonableness" of a particular use of force must be judged from the perspective of "a reasonable officer on the scene," rather than with the 20/20 vision of hindsight. Id.

### D. Municipal Liability

A municipality cannot be held liable under § 1983 on a theory of respondeat superior. Monell v. Dep't of Soc. Services, 436 U.S. 658, 691 (1978).   Thus, a municipality can be subjected to civil liability if the allegedly illegal conduct is "directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." Robinson v. Hunt Cty., Texas, 921 F.3d 440, 449 (5th Cir. 2019) (quoting Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001)).

A claim made against a Texas county under § 1983 is a claim for municipal liability. Flores v. Cameron County, Tex., 92 F.3d 258, 263 (5th Cir. 1996).   "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." Piotrowski, 237 F.3d at 578.   These elements "are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." Id.

"A claim for failure to train must allege sufficient facts to show that (1) the municipality adopted inadequate training policy procedures, (2) acted with deliberate indifference in doing so, and (3) the inadequate training policy directly caused the plaintiff's injury." Speck v. Wiginton, 606 Fed. App'x 733, 736 (5th Cir. 2015).   As to the first element – the existence of inadequate training – the plaintiff must allege facts "related to the locality's actual training program." Id.

As to the second element – that the municipality acted with deliberate indifference

23

– "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary" to meet that standard. <u>Connick v. Thompson</u>, 563 U.S. 51, 62 (2011) (internal quotation marks omitted).   "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." <u>Id</u>.   "The Supreme Court has emphasized that a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Clyce v. Hunt Cty., Tex.</u>, 515 Fed. App'x 319, 323 (5th Cir. 2013) (cleaned up)[9] (citing <u>Connick</u>, 563 U.S. at 61).

The Supreme Court has said that "in a narrow range of circumstances," a plaintiff could use the existence of the incident at issue in the case to prove deliberate indifference, without needing to show a pattern of similar violations. <u>Board of Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397, 409 (1997).   This is referred to as the single incident exception. <u>Id</u>.

The hypothetical example given by the Supreme Court was that if a municipality gave its officers no training at all on the use of deadly force, and an untrained officer used deadly force without justification, the decision to forego training would be so derelict that it would constitute deliberate indifference. <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390, n. 10 (1989).   This single incident exception has been described as "rare." <u>Connick</u>, 563 U.S. at 64.   The Fifth Circuit has said that this exception is "a narrow one, and one that we have been reluctant to expand." <u>Burge v. St. Tammany Par.</u>, 336 F.3d 363, 373 (5th Cir. 2003).   The Circuit has explained that "there is a difference between a <u>complete failure to train</u>, as in <u>Bryan</u>, and a failure to train in one limited area." <u>Cozzo v. Tangipahoa Par. Council—President Gov't</u>, 279 F.3d 273, 288 (5th Cir. 2002) (emphasis original).

---

[9] "Cleaned up" is a parenthetical that signals to the reader that the author "has removed extraneous, non-substantive clutter such as brackets, quotation marks, ellipses, footnote signals, internal citations or made un-bracketed changes to capitalization," in order to make the quotation more readable, but has not altered the substance of the quotation. <u>Na v. Gillespie</u>, 2017 WL 5956773, at *3, 234 Md. App. 742, 174 A.3d 493 (Md. Ct. Spec. App. Dec. 1, 2017); see also <u>Brownback v. King</u>, ––– U.S. –––––, 141 S. Ct. 740, 209 L.Ed.2d 33 (2021) (using "cleaned up").

In short, municipalities do not have an affirmative obligation to have policies which prevent constitutional torts; they have an obligation not to maintain policies which create or condone constitutional torts. Thompson v. Upshur Cty., TX, 245 F.3d 447, 462 (5th Cir. 2001).

"[P]laintiffs generally cannot show deliberate indifference through the opinion of only a single expert." Conner v. Travis County, 209 F.3d 794, 798 (5th Cir. 2000).   The Fifth Circuit has stated that "an expert's opinion should not be alone sufficient to establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards" Stokes v. Bullins, 844 F.2d 269, 275 (5th Cir. 1988).

### E. Qualified Immunity

Qualified immunity protects "government officials performing discretionary functions" from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   Qualified immunity is "an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

Qualified immunity is "a defense against an individual capacity lawsuit." Sanders-Burns v. City of Plano, 594 F.3d 366, 378 (5th Cir. 2010).   "Qualified immunity gives government officials breathing room to make reasonable, but mistaken judgments." Thompson v. Mercer, 726 F.3d 433, 437 (5th Cir. 2014) (internal citation omitted) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

"At summary judgment, it is the plaintiff's burden to rebut a claim of qualified immunity once the defendant has properly raised it in good faith." Cole v. Carson, 802 F.3d 752, 757 (5th Cir. 2015).   "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." Cass v. City of Abilene, 814 F.3d 721, 728 (5th Cir. 2016) (internal quotations omitted).

25

The plaintiff's burden has been described as a "demanding" one. Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015). The plaintiff must establish: (1) that the defendant's actions violated the plaintiff's constitutional rights; and (2) that those rights were clearly established at the time of the defendant's actions. Pearson v. Callahan, 555 U.S. 223 (2009). "To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present absolute proof, but must offer more than mere allegations." Manis v. Lawson, 585 F.3d 839, 843 (5th Cir. 2009) (internal quotation marks omitted).

In deciding a motion for summary judgment based on the invocation of qualified immunity, the Court must engage in two separate inquiries: (1) "whether a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law," and (2) "whether a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." Cantrell v. City of Murphy, 666 F.3d 911, 921 (5th Cir. 2012) (citing Wernecke v. Garcia, 591 F.3d 386, 391 (5th Cir. 2009)).

## III. Analysis

There can be little doubt that Gabriel Rivera was failed by the system and that failure led to his death.   But that is not the question before the Court.   The Court must consider whether any defendant violated his constitutional rights prior to his death.   The Plaintiffs have made claims against the individual Defendants as well as against Cameron County. The Court will first address the claims against the individual Defendants, concluding that those defendants did not violate his rights.   The Court will then address the claims against Cameron County, concluding that the Plaintiffs have not shown a genuine dispute of material fact that any county policies violated his constitutional rights.

### A. Individual Defendants

The only claims made against the individual Defendants are related to the excessive use of force during the cell extraction.   The Plaintiffs claim that all of the individual defendants either used excessive force or failed to prevent their co-workers from using such force.

The Court is left in an unusual position.   There is no video of the incident itself. And Rivera, who was subjected to the force, is obviously unavailable to testify.   Thus, the Court is left with the statements of the defendants themselves, none of whom can be described as a disinterested witness.   All of the narrative evidence as to what happened during the cell extraction comes from the individual defendants, "which makes it difficult for Plaintiff to create a genuine issue of material fact." Goodman v. Harris Cty., 239 Fed. App'x 869, 873 (5th Cir. 2007).

The Fifth Circuit has instructed district courts to examine "the surrounding circumstances and forensic evidence" to determine if there is a genuine issue of material fact. Goodman, 239 Fed. App'x at 874 (citing Bazan ex rel. Bazan v. Hidalgo County, 246 F.3d 481 (5th Cir. 2001)).   In other words, the Court must consider whether there is circumstantial evidence that discredits the defendant's narrative and could convince a rational factfinder that the defendants acted unreasonably. Id.   The Plaintiffs have cited Bazan for the proposition that when the only surviving witnesses are defendants, then "that situation alone raises a fact question that defeats summary judgment." Dkt. No. 86, p. 38.

The Fifth Circuit did not create a per se rule that summary judgment is inappropriate when the only surviving witnesses are defendants.   Indeed, the Fifth Circuit has held that summary judgment was appropriate in a case where the defendants were the only surviving witnesses and there was "nothing in the summary judgment record that casts doubt on the veracity of the [defendants'] version of the events." Aujla v. Hinds Cty., Mississippi, 61 Fed. App'x 917 (5th Cir. 2003).   Thus, the Court will first consider whether under the officers' narrative, in the light most favorable to the Plaintiffs, they used excessive force. Then the Court will consider whether there is circumstantial evidence in the record that casts doubt on the veracity of that narrative.

### 1. Officers Narrative

While the Court has previously detailed the officers' narrative, it will recount it again in a brief summary.   The Court has written this summary in the light most favorable to the Plaintiffs.

A member of the jail's medical team instructed the jail team to move Rivera to a padded cell for Rivera's own safety; Cantu instructed Rivera to put his hands through the food slot of the cell door so he could be handcuffed.   Rivera refused.   Cantu tried to give Rivera a suicidal smock; Rivera refused.   Cantu sprayed Rivera's face with pepper spray in an effort to obtain compliance; Rivera did not comply.   A second use of the pepper spray only agitated Rivera further.

Cantu knew that Rivera had punched a jailer in the face when he was moved out of his cell earlier that day.   He also knew that Rivera was a former professional boxer who knew how to use force.   Cantu took at least nine officers into the cell with him to extract Rivera and move him to the padded cell.   Officer Flores used a riot shield to push Rivera against a wall and the other officers moved to grab Rivera's arms and legs.   Rivera did not comply with the orders to give up his hands and legs, but did not strike any officer.   He did push-ups with officers on his back, indicating that at least some of the officers were on his back and not solely holding on to his legs and arms.

Once Rivera was handcuffed and his legs were shackled, the officers placed him in a restraint chair.   When Rivera continued to try to stand up, the officers pushed him down and strapped him to the chair.   During this time, Rivera was spitting blood at the officers; some of the officers held his head downward when he sat in the chair, so as to keep him from spitting more blood on them.   A spit mask was placed on Rivera's face, even though he had been pepper-sprayed in the face.   When Rivera was wheeled out of his cell, he was still talking, but he had no heartbeat when he arrived at the medical area.   The Court notes that the video neither contradicts nor confirms the veracity of this narrative.   The video is not inconsistent with the narrative, but does not show what happened inside of the cell.

The Court "must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." Kingsley v. Hendrickson, 576 U.S. 389, 399 (2015).   "Factors relevant to a determination of reasonableness include the relationship between the need for the use of force and the amount of force used, efforts to temper or to limit force, the threat reasonably perceived by the officer, the extent of the

plaintiff's injury, and whether the plaintiff was resisting." <u>Tennyson v. Villarreal</u>, 801 Fed. App'x 295, 296 (5th Cir. 2020) (citing <u>Kingsley</u>, 576 U.S. at 397).   All of these factors point towards the force used against Rivera as being reasonable.

The officers knew that Rivera was a boxer who had previously punched a jailer officer, making him a danger to them.   Cantu tried to temper the use of force, as he unsuccessfully used verbal commands and pepper spray to obtain compliance.   When the officers entered the cell and took Rivera to the ground, he continued to struggle and refused to comply.   Rivera spit blood at the officers, putting them in danger of blood-borne diseases.   No officer saw any other officer punch or kick Rivera.   Under these circumstances, the force used was reasonably related to the threat posed by Rivera and was not excessive to the need to move him to the padded cell.

Furthermore, while Rivera's delusional state was regrettable – and possibly preventable – it does not temper the need for the officers to use force.   The Supreme Court has never held that officers are required to accommodate a suspect's mental disability when making use of force determinations; it has opined, however, that "the opposite may be true." <u>City & Cty. of San Francisco, Calif. v. Sheehan</u>, 575 U.S. 600, 617 (2015).   "[A]n officer is not precluded from <u>reasonably</u> using force against a mentally ill individual." <u>Ramirez v. Escajeda</u>, 2021 WL 3713064, at *31 (W.D. Tex. Aug. 20, 2021) (emphasis original).   "Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public." <u>Bates v. Chesterfield Cty.</u>, 216 F.3d 367, 372 (4th Cir. 2000).

In determining whether excessive force was used, the Court "must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." <u>Kingsley</u>, 576 U.S. at 397 (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 540 (1979)) (cleaned up).   The officers were moving Rivera to a padded cell at the instruction of the medical staff.   Furthermore, jail officers "are within their rights to

use objectively reasonable force to obtain compliance from prisoners." <u>Dawson v. Anderson Cty., Tex.</u>, 566 Fed. App'x 369, 370 (5th Cir. 2014).   Rivera refused to comply with verbal instructions; refused to listen after being pepper sprayed; and, refused to submit to being handcuffed and shackled.   Indeed, at no point in this narrative did Rivera willingly submit to the officers' commands.   Under the narrative given by the officers, they did not use excessive force.   However, as discussed earlier, this does not end the inquiry.

## 2. Evidence Undercutting Narrative

Because the only surviving witnesses to the use of force are the individual defendants – all of whom have an obvious interest in testifying in a manner that helps their case – the Court must consider whether there is any circumstantial evidence which undercuts this narrative.   For example, if a police officer claimed that he shot a suspect in self-defense after wrestling him down in a muddy field and forensic evidence showed that the officer's uniform was not muddy, that is evidence which would undercut the narrative. <u>Goodman v. Harris Cty.</u>, 571 F.3d 388, 398 (5th Cir. 2009).   Similarly, if an officer claimed he shot a suspect in self-defense after being bit on the hand, but received no medical attention for a bite mark and had no teeth marks in his hand, that evidence would undercut the officer's narrative. <u>Bazan</u>, 246 F.3d at 492.   Additionally, if an officer claimed he shot a suspect in self-defense because the suspect was reaching for a gun, but the autopsy report showed that the suspect was shot at point-blank range while laying prone on the floor, that evidence would undercut the officer's narrative. <u>Pineda v. City of Houston</u>, 124 F. Supp. 2d 1037, 1055 (S.D. Tex. 1999).   On the other hand, if the evidence does not contradict the officer's narrative, mere conjecture or speculation will be insufficient to defeat summary judgment. <u>Ontiveros v. City of Rosenberg, Tex.</u>, 564 F.3d 379, 385 (5th Cir. 2009)

In making this determination, as to whether any officer used unreasonable force, the Court is looking for circumstantial evidence that: (1) the officers used more force against Rivera than they admitted to in their deposition testimony or (2) that Rivera stopped

resisting them before they stopped using force against him. See Cowart v. Erwin, 837 F.3d 444, 454 (5th Cir. 2016) (jail officials may not "use gratuitous force against a prisoner who has already been subdued.").

There is no circumstantial evidence which shows that the defendants used more force against Rivera than they admitted to in their deposition testimony. While the video does not show exactly what happened inside of the cell, the events that it does show are consistent with their testimony. Furthermore, the plaintiffs cannot merely rest on the medical evidence in this case.

While the medical evidence shows that Rivera suffered broken bones in his face and broken ribs, it does not undercut the officers' narrative. Dr. Miller stated that she was unable to ascertain if the broken ribs occurred during the altercation or when CPR was performed. The plaintiffs have produced no evidence tending to show that the broken bones were caused by force other than that which the officers have admitted to using, such as being punched, kicked, or kneed in the back.

The Plaintiffs cannot merely point to the injuries suffered by Rivera as undercutting the defendants' narrative. A jury, on its own, is not capable of reviewing this medical evidence and coming to a reasoned conclusion. "[W]hen conclusions as to the evidence cannot be reached based on the everyday experiences of jurors, expert testimony is needed." Gowdy v. Marine Spill Response Corp., 925 F.3d 200, 206 (5th Cir. 2019) (internal quotation marks omitted).

A layman lacks the background to discern how Rivera suffered the injuries to his face and ribs, especially given that there are several competing causes: Rivera's self-inflicted injuries; Rivera's actions in response to his extraction; the force used by the officers; and the medical attention given after the extraction. See O'Bryant v. Walker Cty., 2009 WL 3073924, at *5 (S.D. Tex. Sept. 21, 2009) (whether the officer's actions or inactions could have caused the suspect's death required expert testimony as to causation).

The Plaintiffs have offered no expert testimony which shows that Rivera's injuries are inconsistent with the officers' testimony. Dr. Mitchell argues that the extraction

caused Rivera's heart attack and that Dr. Miller should not have diagnosed Rivera with Brugada Syndrome based solely on the blood test. Dkt. No. 96-8, pp. 5-6.   While Dr. Mitchell's testimony is relevant as to the cause of death, it does not speak to the issue of whether the individual defendants used more force than they admitted to.   As such, there is no probative evidence that the officers used more force than they admitted to.

Furthermore, there is no evidence that Rivera stopped resisting the individual defendants.   As such, there is no circumstantial evidence which undercuts the narrative and shows that any individual defendant used excessive force during the extraction.   The motion for summary judgment should be granted.

### 3. Bystander Liability

The Plaintiffs have sought bystander liability against the individual Defendants, arguing that even if they did not use excessive force against Rivera, they did not stop a co-defendant from using such force.   Summary judgment is appropriate as to this claim.

In order to sustain a bystander liability claim, Plaintiffs must introduce facts showing that the officer: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Whitley v. Hanna, 726 F.3d, 631 646 (5th Cir. 2013) (quoting Randall v. Prince George's Cnty., Md., 302 F.3d 188, 204 (4th Cir. 2002)).

The Plaintiffs' case fails to meet the first element.   As the Court has already found, there is no genuine dispute of material fact as to whether any officer used excessive force against Rivera.   "An individual cannot be held liable under the theory of bystander liability when the evidence does not support a finding that anyone violated Plaintiff's constitutional rights." Charlot v. City of Houston, 2017 WL 6060108, at *8 n. 55 (S.D. Tex. Dec. 7, 2017), aff'd, 757 Fed. App'x 310 (5th Cir. 2018) (citing Whitley, 726 F.3d at 646). Because the Plaintiffs cannot meet an essential element of this claim, summary judgment is appropriate. See Vela v. City of Houston, 276 F.3d 659, 666 (5th Cir. 2001) ("if the non-movant fails to present facts sufficient to support an essential element of his claim, summary judgment is appropriate").

### 4. Qualified Immunity

The individual Defendants have pled qualified immunity.   As previously noted, the Plaintiffs must establish: (1) that the defendant's actions violated the plaintiff's constitutional rights; and (2) that those rights were clearly established at the time of the defendant's actions. <u>Pearson</u>, 555 U.S. 223.   As to the second element, it has been clearly established that a pretrial detainee has the right to be free from the excessive use of force within a jail setting. <u>Valencia v. Wiggins</u>, 981 F.2d 1440, 1446 (5th Cir. 1993).

What has not been shown, however, is that any individual Defendant violated Rivera's constitutional rights.   "If [the Court] determine[s] that the alleged conduct did not violate a constitutional right, [the] inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity." <u>Lytle v. Bexar Cty., Tex.</u>, 560 F.3d 404, 410 (5th Cir. 2009).   As such, the Court finds that qualified immunity is unnecessary in this case.

In sum, all of the individual Defendants are entitled to summary judgment for the claims made against them.   The Court now turns to the claims made against Cameron County.

### B. Cameron County

The Plaintiffs make the following claims against Cameron County: failure to have an official policy about the proper use of force; failure to reinforce its procedures through in-service training, failure to have a proper alcohol withdrawal policy and failure to have a proper severe alcohol withdrawal policy.   The Court will examine the final two claims in a single section.

The Court begins by noting that a municipality is not required to have an affirmative policy that prevents constitutional violations.   Instead, the requirement is that the municipality not have a policy that results in constitutional violations.   The difference is more than semantics.   <u>See</u> <u>Warren v. District of Columbia</u>, 353 F.3d 36, 39 (D.C. Cir. 2004) (Municipalities are not required "to take reasonable care to discover and prevent constitutional violations.").

Put another way, <u>Monell</u> and its progeny do not hold municipalities liable for failing to adopt best practices, but for failing to stop its worst ones. <u>See</u> <u>Webster v. City of Houston</u>, 735 F.2d 838, 855 (5th Cir. 1984) (<u>en</u> <u>banc</u>) (Williams., J., dissenting) ("The spirit and the reality of <u>Monell</u> make municipalities and their public officials liable for unconstitutional policies they enforce or customs they condone").   Thus, the Court's focus is on whether Cameron County knowingly condoned a policy or custom of constitutional violations, not whether their policies could have been improved to avoid such violations.

### 1. Use of Force

The Plaintiffs assert that Cameron County is liable because it does not have an official policy on the proper use of force.   Summary judgment is appropriate as to this claim.

First, to succeed on this claim, the Plaintiffs must show that there is a genuine dispute of material fact that "an underlying constitutional violation" occurred. <u>Patterson v. McDermitt</u>, 2022 WL 949859, at *7 (M.D. La. Mar. 29, 2022) (citing <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 578 (5th Cir. 2001)).   As recounted earlier, the Plaintiffs have failed to show that there is a genuine dispute of material fact that any Cameron County employee used excessive force against Rivera.   Given this failure to meet their evidentiary burden, it is axiomatic that Cameron County cannot be held liable for excessive force. <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have <u>authorized</u> the use of constitutionally excessive force is quite beside the point.") (emphasis original).   Summary judgment is appropriate on this ground.

Furthermore, the Plaintiffs have not pointed to any constitutional requirement that a municipality must have an official policy on the proper use of force.   This is because such caselaw does not exist.   As previously noted, a municipality is not required to prevent violations, but to avoid policies which condone or create violations. <u>Warren</u>, 353 F.3d at 39.

Indeed, this is why caselaw requires the Plaintiffs to demonstrate a pattern of similar incidents where constitutional rights were violated in order to hold a municipality liable. Snyder v. Trepagnier, 142 F.3d 791, 798 (5th Cir. 1998).   A municipality cannot be held liable for failing to stop constitutional violations if it is not aware of such violations. O'Quinn v. Manuel, 767 F.2d 174, 177 (5th Cir. 1985) ("liability may result if municipal officials have actual or constructive knowledge of constitutional violations and fail to carry out their duty to correct them").   There is no evidence in the record that the lack of a written policy on use of force has resulted in any inmate being subjected to constitutionally excessive force.   Summary judgment is also appropriate on this ground, as to this claim.

### 2. Failure to Use Ongoing Training

The Plaintiffs allege that Cameron County is liable for not requiring or providing ongoing in-service training for jail employees.   Summary judgment is also appropriate as to this claim.

As noted earlier, the Plaintiffs must show a genuine dispute of material fact that "an underlying constitutional violation" occurred. Patterson, 2022 WL 949859, at *7.   Again, given that the Plaintiffs have failed to show that there is a genuine dispute of material fact that Rivera was subjected to excessive force, Cameron County cannot be held liable for excessive force. Heller, 475 U.S. at 799.   Accordingly, summary judgment is appropriate on this ground.

Furthermore, the Court again notes that there is no caselaw supporting the claim that ongoing training is constitutionally required.   While it may be a best practice, municipal liability does not require that best practices be enacted. Warren, 353 F.3d at 39.

"The Supreme Court has emphasized that a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Clyce, 515 Fed. App'x at 323 (citing Connick, 563 U.S. at 61).   Additionally, the Plaintiffs cannot just focus on the lack of ongoing training without also considering all of the training that the jail employees received.

The Fifth Circuit stated that "a rule of 'no special training = deficient training' must be rejected because it would ignore the training the officers did receive in basic recruit training." Pineda v. City of Houston, 291 F.3d 325, 334 (5th Cir. 2002) (cleaned up) (quoting Palmquist v. Selvik, 111 F.3d 1332, 1345 (7th Cir. 1997)).   All of the officers in this case testified that they were trained and licensed as county jailers pursuant to training provided by the Texas Commission on Law Enforcement.   Indeed, such training is legally mandated. TEX. OCC. CODE § 1701.301.   Because these officers all met the state standards, "there can be no liability unless the plaintiff shows that this legal minimum of training was inadequate." Livezey v. The City of Malakoff, 657 Fed. App'x 274, 278 (5th Cir. 2016) (internal quotation marks omitted) (quoting Benavides v. Cnty. of Wilson, 955 F.2d 968, 973 (5th Cir. 1992)).

While the Plaintiffs' expert, Steve J. Martin, states that ongoing in-service training is "an essential and core element for the safe operation of a jail," he never states why the state-mandated training is constitutionally inadequate.   There must be evidence in the record showing that the state standards are "inadequate" to enable officers "to deal with the usual and recurring situations faced by jailers and peace officers." O'Neal v. City of San Antonio, 344 Fed. App'x 885, 888 (5th Cir. 2009).   The Court notes that it has not found a single case where a Texas federal district court or the Fifth Circuit have held that the Texas Commission on Law Enforcement training was constitutionally inadequate to train officers on the proper use of force.   Indeed, all of the cases to address this issue have held the opposite.[10]   Accordingly, summary judgment is appropriate as to this claim.

---

[10]. Livezey v. The City of Malakoff, 657 Fed. App'x 274, 278 (5th Cir. 2016); Clyce v. Hunt Cty., Tex., 515 Fed. App'x 319, 323 (5th Cir. 2013); Sanders-Burns v. City Of Plano, 594 F.3d 366, 382 (5th Cir. 2010); O'Neal v. City of San Antonio, 344 Fed. App'x 885, 889 (5th Cir. 2009); Pineda, 291 F.3d at 334; Flores v. Harris, 2019 WL 1426313, at *29 (S.D. Tex. Mar. 29, 2019); Moreno v. Northside I.S.D., 2013 WL 3716531, at *3 (W.D. Tex. July 12, 2013); Martinez v. City of Alton, Texas, 2018 WL 1333884, at *4 (S.D. Tex. Mar. 15, 2018); Holley v. Blomberg, 142 F. Supp. 3d 517, 528 (S.D. Tex. 2015); Williams v. City of Houston, Texas, 2019 WL 2435854, at *14 (S.D. Tex. June 11, 2019); Martinez v. City of Buda, Texas, 2018 WL 837609, at *7 (W.D. Tex. Feb. 13, 2018); Heckford v. City of Pasadena, 2022 WL 209747, at

Furthermore, Martin's testimony is insufficient to create a genuine issue of material fact.   As previously noted, Plaintiffs cannot create a genuine issue of material fact as to deliberate indifference with the testimony of a single expert. <u>Conner</u>, 209 F.3d at 798; <u>Stokes</u>, 844 F.2d at 275.   There must be some evidence in the record which supports the inference that Cameron County's "motives were contrary to constitutional standards." <u>Stokes</u> at 275.   There is no evidence in the record showing that Cameron County was aware that its officers were using constitutionally excessive force and chose inaction in the face of such facts. <u>Id.</u>   As such, summary judgment is, again, appropriate as to this claim.

### 3. Alcohol Withdrawal Protocols

The Plaintiffs allege that Cameron County is liable for failing to have a proper alcohol withdrawal protocol and a proper severe alcohol withdrawal protocol.   Again, summary judgment is appropriate for these claims.

"To establish a claim under § 1983 against a municipality, the plaintiff must, among other things, establish a constitutional violation." <u>Lindsay v. City of Beeville</u>, 288 Fed. App'x 982, 984 (5th Cir. 2008) (citing <u>Meadowbriar Home for Children v. Gunn</u>, 81 F.3d 521, 533 (5th Cir. 1996)).   The only possible constitutional violation would be of Rivera's right to adequate medical care.   Indeed, "pretrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials." <u>Thompson v. Upshur County</u>, 245 F.3d 447, 457 (5th Cir. 2001).   At the same time, there

---

*11 (S.D. Tex. Jan. 21, 2022); <u>Harper v. McAndrews</u>, 499 F. Supp. 3d 312, 325 (E.D. Tex. 2020); <u>Marshall v. Russell</u>, 391 F. Supp. 3d 672, 694 (S.D. Tex. 2018); <u>Villasana v. City of San Antonio</u>, 2014 WL 640965, at *12 (W.D. Tex. Feb. 18, 2014); <u>Haywood v. Johnson</u>, 2014 WL 4929311, at *9 (W.D. Tex. Oct. 1, 2014); <u>Morrow v. Eastland Cty., Texas</u>, 2019 WL 2619475, at *3 (N.D. Tex. June 10, 2019), report and recommendation adopted, 2019 WL 2619306 (N.D. Tex. June 26, 2019).   In the only case that allowed such claims, there was a factual dispute about whether the officer in question actually received the state-mandated training. <u>Hobart v. City of Stafford</u>, 784 F. Supp. 2d 732, 754 (S.D. Tex. 2011) ("the parties vigorously dispute whether Officer Estrada indeed received the training mandated by TCLEOSE").

is no genuine dispute of material fact as to whether Rivera's serious medical needs were met with deliberate indifference.   Simply stated, there was no deliberate indifference.

"Deliberate indifference is an extremely high standard to meet.   A prison official displays deliberate indifference only if he (1) knows that inmates face a substantial risk of serious bodily harm and (2) disregards that risk by failing to take reasonable measures to abate it." Taylor v. Stevens, 946 F.3d 211, 221 (5th Cir. 2019).   "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." Sanchez v. Oliver, 995 F.3d 461, 473 (5th Cir. 2021).

The record in this case shows that Cameron County employees were not deliberately indifferent to Rivera's serious medical needs.   Rivera was seen by a nurse after his family called with concern about his mental state and he was taken to a hospital when he continued to act erratically. See Rogers v. Boatright, 709 F.3d 403, 410 (5th Cir. 2013) ("because the officers took Rogers to see a V.A. hospital physician after the incident and transported him subsequently to the prison medical department for treatment, they did not act with wanton disregard for Rogers's serious medical condition").   Indeed, a nurse at the jail properly identified Rivera as suffering from alcohol withdrawal and he was taken to a hospital for medical clearance. Dkt. No. 87-11, p. 6.

It is tragic that none of the medical professionals at the hospital – including the emergency room doctor – properly diagnosed Rivera with delirium tremens.   It is also tragic that the jail's assessment that Rivera was suffering from alcohol withdrawal was not clearly communicated to the hospital staff.   Based on this record, a person could argue that Rivera's medical treatment was negligent or even constituted medical malpractice.   Such failings, however, do not constitute deliberate indifference by any Cameron County employee.   "There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help." Fielder v. Bosshard, 590 F.2d 105, 108 (5th Cir. 1979).   The record shows that the Cameron County employees were part of

an earnest and unsuccessful attempt to help Rivera.    As such, no constitutional violation occurred, and summary judgment is appropriate.

Furthermore, the Plaintiffs again misunderstand what the Constitution requires Cameron County to do.    Cameron County is not constitutionally required to have a proper alcohol withdrawal protocol or to properly train its employees on how to recognize and treat such withdrawal.    Rather, Cameron County is required not to have policies in place that preclude people suffering from withdrawal from having their serious medical needs addressed.    Thompson, 245 F.3d at 462 (holding that policymakers are not required to provide medical training concerning alcohol withdrawal, just that they are not allowed to "have policies in place that preclude serious medical needs, like DTs [delirium tremens], from being met.").    To put it another way, Rivera was not constitutionally entitled to an affirmatively valid alcohol withdrawal treatment; he was entitled to a policy that did not impede such treatment.    Ivory v. Burns, 2005 WL 3113016, at *7 (W.D. La. Nov. 21, 2005).

For example, if a county had a policy that one ambulance must remain in the county at all times and this policy prevented an inmate suffering from alcohol withdrawal from receiving timely treatment at an out-of-county hospital, it could create municipal liability on the grounds that it prevented a prisoner from having his serious medical needs met. Borum v. Swisher Cty., 2014 WL 4814541, at *8 (N.D. Tex. Sept. 29, 2014).    The Plaintiffs have not shown that the lack of an alcohol withdrawal policy impeded Rivera's ability to receive medical treatment.    He was seen by jail medical professionals and was taken to a hospital for treatment.    The lack of a policy did not constitute deliberate indifference in this case.

Additionally, the only evidence that the Plaintiffs have to show deliberate indifference is the testimony of Dr. Jeffrey Keller, who argues that the written protocol was insufficient to treat an inmate suffering from withdrawal. Dkt. No. 96-5, p. 7.    Dr. Keller's testimony, standing alone, is insufficient to create a genuine issue of material fact. Conner, 209 F.3d at 798; Stokes, 844 F.2d at 275.    Simply stated, there is no evidence in the record that supports the inference that Cameron County was aware that its protocol was deficient

and chose to keep it anyways. Accordingly, upon this ground as well, summary judgment is appropriate.

In sum, the Plaintiffs have failed to show a genuine dispute of material fact as to any of its claims for municipal liability against Cameron County. The motion for summary judgment will be granted as to all of these claims.

## IV. Order

The Defendants' motion for summary judgment is granted in all respects against all Defendants. The Court will issue a judgment that the Plaintiffs take nothing in this case.

DONE at Brownsville, Texas, on April 13, 2022.

Ronald G. Morgan
United States Magistrate Judge